**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **FEDERAL TRADE COMMISSION**, and<br><br>**PEOPLE OF THE STATE OF NEW YORK, by ERIC T. SCHNEIDERMAN, Attorney General of the State of New York**,<br><br>Plaintiffs,<br>v.<br><br>**4 STAR RESOLUTION LLC**, et al.<br><br>Defendants. | Case No. 15-CV-112S<br><br>PRELIMINARY REPORT OF RECEIVER<br><br>$<br>$ |

I.     <u>Summary</u>

The undersigned was appointed as Receiver in the above captioned matter, pursuant to an

Ex Parte Temporary Restraining Order With An Asset Freeze, Appointment of a Receiver, and

Other Equitable Relief, etc. (the "Ex Parte Order") filed on February 10, 2015 (see Docket # 29).

Pursuant to the Ex Parte Order, the Receiver has been appointed the temporary Receiver

of the following (collectively, the "Receivership Defendants"):   4 Star Resolution LLC ("4

Star"), Profile Management, Inc. ("Profile"), International Recovery Service LLC ("IRS"),

Check Solutions Services Inc., Check Fraud Service LLC, Merchant Recovery Service, Inc.

("Merchant"), and Fourstar Revenue Management LLC as well as "any other business related to

the Defendants' debt collection business and which the temporary Receiver has reason to believe

is owned or controlled in whole or in part by any of the Defendants, and includes fictitious

names under which they do business." (see Ex Parte Order, pg. 6, par. L).

This Preliminary Report provides information regarding the Receiver's actions taken

through May 28, 2015 to comply with the Court's Ex Parte Order.  In addition, the Receiver is

providing a summary of the assets and liabilities of the Receivership identified at this time and

an initial assessment of the Corporate Defendants and their ability to operate lawfully and

1

profitably in the future.  Much of the information provided herein is investigative in nature and reflects preliminary observations and conclusions that may be subject to change as additional information becomes available.

## II.        Reporting Requirements

Section XIV of the Ex Parte Order directs the Receiver to report to the Court regarding: 1) steps taken by the Receiver to implement the terms of the Ex Parte Order, 2) the value of all liquidated and unliquidated Assets[1] of the Receivership Defendants, 3) the sum of all liabilities of the Receivership Defendants, 4) the steps the Receiver intends to take in the future to (a) prevent diminution in the value of Assets of the Receivership Defendants, (b) pursue Receivership Assets from third parties, and (c) adjust the liabilities of the Receivership Defendants, if appropriate, 5) whether the business of the Receivership Defendants can be operated lawfully and profitably, and 6) any other matters the Receiver believes should be brought to the Court's attention.

## III.       Actions Taken to Date

### A.        Assumption of Control

On February 11, 2015, the Receiver, his counsel, Hodgson Russ, LLP, personnel from the Federal Trade Commission and the New York State Attorney General's Office and uniformed personnel from, the Buffalo Police Department, the Cheektowaga Police Department and the Charlotte-Mecklenburg Police Department arrived at the five offices of the Corporate Defendants:

4 Star Resolution LLC                           Profile Management Inc.
2400 Seneca Street                              1839 Seneca Street
Buffalo, New York  14210                        Buffalo, New York  14210

---

[1]        Capitalized terms not defined herein shall have the meanings ascribed to them in the Ex Parte Order.

International Recovery Service LLC  
2800 Walden Avenue  
Cheektowaga, NY  14225

International Recovery Service LLC  
3735 Genesee Street  
Cheektowaga, NY  14225

Merchant Recovery Service Inc.  
8514 McAlpine Park Drive  
Suite 280  
Charlotte, NC 28211-5204

The three individual Defendants were not present at the various offices.  The Ex Parte Order was presented at all of the Corporate Defendants' locations and all personnel present were instructed to step away from their desks.  Once the premises were secured, the Receiver then permitted representatives from the FTC and the Attorney General's Office access to the Corporate Defendants' offices.  Plaintiff's representatives gathered information throughout the day, identified documents for copying and imaged computers.  Keys to the premises were surrendered to the Receiver's representatives.

My counsel asked employees to fill out questionnaires seeking basic information regarding contact information, job duties, wages owed, computer passwords and the like.  The employees were asked to remain on the premises to be interviewed.  My agents interviewed employees at each of the locations other than Charlotte.  In Charlotte all of the employees left the premises when the Receiver's counsel took possession of the location.  Approximately 58 debt collectors/point callers and 15 administrative and management personnel were present and interviewed.  In total 73 employee questionnaires were completed.  The debt collector interviews were focused on understanding the operations of the company, the duties of individual collectors and how collectors were compensated.

Interviews of the managers focused on the operations of the business, compliance monitoring, payroll, and covered a variety of administrative topics such as the location of

3

records, computer passwords and office keys.  The managers provided information regarding monitoring of collection calls, revenues of certain of the Corporate Defendants and payment processing.  Jae Ovitt, Director of IT, was also interviewed.  Mr. Ovitt provided general information regarding the software used by the Corporate Defendants to maintain information about the debt portfolios, the debtors and to collect the funds debtors agreed to pay pursuant to collection efforts.

The Receiver's agents also worked with the Corporate Defendants' managers and administrative support staff to begin the process of understanding the payroll process in the event sufficient funds were identified to make payroll for any of the Corporate Defendants.

Other activities in the days following the immediate access on February 11, 2015 included hiring a locksmith to change office locks, contacting building management regarding lease documents, determining locations for receipt of mail, conducting a general overview of the office spaces and storage areas, imaging computers and other electronically stored information, and beginning the process of opening Receivership bank accounts.

Counsel for the Receiver also coordinated with the Plaintiffs to confirm the Ex Parte Order was served on banking institutions and payment processing vendors to expedite the process of recovering assets frozen pursuant to the Ex Parte Order. The Receiver established separate bank accounts for assets seized from 4 Star, Profile, Merchant and IRS.  The Receiver then initiated contact with all banking institutions known to do business with the Corporate Defendants to request transfer of the frozen funds.  Payment processors who did business with the Corporate Defendants were also contacted.  The Receiver has recovered a total of $447,845.39 from payment processors as of the date of this Report.

4

The Receiver retained Kelly Besaw of Chiampou, Travis, Besaw & Kershner LLP a forensic accountant, to conduct a review of the banking and accounting records of the Corporate Defendants. Receiver's counsel worked with Mr. Besaw to attempt to gain access to the Corporate Defendant's books and records to enable a thorough review of the financial affairs of the Corporate Defendants to support this Report.

### B.     Examination of Defendants

The following is not intended to be a comprehensive summary of the deposition testimony given pursuant to the plaintiff's expedited discovery. However, the Receiver believes it is important to update the Court on the status of the principals of the Corporate Defendants' cooperation with the terms of the Ex Parte Order.

### I. Travell Thomas

On May 5, 2015, Mr. Thomas was subject to a deposition pursuant to the Ex Parte Order. The Receiver was present for this deposition but was unable to question Mr. Thomas due to time constraints. The Receiver has issued a subpoena to take the deposition of Mr. Thomas but that deposition has yet to be scheduled. However, the Receiver was able to obtain certain information as to Mr. Thomas' role in the operation of the businesses from his own investigation, Mr. Thomas' financial disclosures and the FTC's examination of Mr. Thomas.

5





In the Receiver's opinion, Mr. Thomas has not made a good faith effort to disclose the nature and location of the assets of the Corporate Defendants.

**II. <u>Maurice Sessum</u>:**

On May 1, 2015, Mr. Sessum was subject to a deposition by the FTC pursuant to the Ex Parte Order.  The Receiver was present for the FTC's deposition but did not directly question Mr. Sessum due to time constraints.  The Receiver has issued a subpoena to take the deposition of Mr. Sessum which has yet to be scheduled.





Mr. Sessum's testimony provided little insight into the nature and location of the Corporate Defendants' assets.

### III. Charles Blakely:

On May 5, 2015, Mr. Blakely was subject to a deposition by the FTC pursuant to the Ex Parte Order. The Receiver was present for the FTC's deposition but did not directly question Mr. Blakely due to time constraints. The Receiver has issued a subpoena to take the deposition of Mr. Blakely which has yet to be scheduled.



### C.    <u>Funding Payroll</u>

The Receiver's primary focus of the weeks immediately following his appointment was to assess the available assets of the Receivership and the obligation and ability of the Receivership to pay outstanding wages to employees for pre-Receivership work.  The Corporate Defendants utilized Paychex to coordinate payroll and certain employee benefits.  While the Ex Parte Order was served on the Corporate Defendants banks on or about February 11, 2015, it took the banks until March 12, 2015 to transfer funds to the accounts set up by the Receiver. With the funds frozen by the Ex Parte Order, the Receiver was able to directly fund payroll for Profile, 4 Star and IRS.  Funding for Merchant Recovery's payroll was accomplished through the transfer of funds from Profile to Merchant on the consent of the Corporate Defendants.  Bonuses for Profile, IRS and 4 Star employees were calculated with the assistance of the office managers and "admins."  January bonus amounts were processed along with the last payroll for 4 Star, Profile and IRS on or before April 10, 2015.

Merchant's last full two week pay period was funded prior to the appointment of the Receiver.  However, the funds which were to cover that two week payroll were frozen pursuant to the Ex Parte Order.  Therefore while the employees received their wages, the Receiver had to reimburse Paychex for the funds to cover the pay period from January 26, 2015 to February 8, 2015.  There were significant delays in funding payroll for Merchant with respect to the pay period from February 9, 2015 to February 11, 2015.  As only a few Merchant employees filled out questionnaires, the Receiver had to request the landlord in Charlotte to provide the time clock for that location.  The Receiver then accessed the time clock and was able to obtain only partial information on the wages owed due to employees who had failed to either punch in at the beginning of a shift or punch out at the end of a shift.  With the assistance of Mr. Blakely and his counsel, the Receiver was able to fully process the final three days of Merchant's payroll. In total, the Receiver has funded payroll in the amount of $257,065.12.

Several employees have contacted the Receiver regarding accrued vacation pay as well as the status of their retirement accounts.  The Receiver will continue to address payroll and employee benefits issues as they arise.  The Receiver anticipates that further employee claims for wages or benefits will be addressed through a claims bar date process if there are sufficient assets remaining in the estate to justify the procedure.

**IV.**     **Assets of the Receivership**

Pursuant to the Ex Parte Order, the identifiable assets of the Corporate Defendants, were frozen.  The following accounts were frozen and moved into Receivership Accounts at M&T Bank:

| Name and Address of Financial Institution | Name on Account | Account Number(s) | Total Balance turned over to Receiver | Receiver Account Deposited to |
|---|---|---|---|---|
| RBS Citizens Bank One Citizens Drive Mail Stop: ROP210 Riverside, RI 02915 | 4 Star Resolution LLC, d/b/a Consumer Recovery Group, Four Star Capital Services, Four Star Resolution Services, LLC and FS Mediation Group | xx6841 xx6868 xx6876 | $156,224.92 | 4 Star Resolution, Garry Graber as Receiver. |
| M&T Bank P.O. Box 844 Buffalo, NY  14240 | 4 Star Resolution LLC, d/b/a Consumer Recovery Group, Four Star Capital Services, Four Star Resolution Services, LLC and FS Mediation Group | xx7866 xx4866 xx0300 | $25,237.00 | 4 Star Resolution, Garry Graber as Receiver. |
| RBS Citizens Bank One Citizens Drive Mail Stop: ROP210 Riverside, RI 02915 | Profile Management, Inc. | xx6884 xx6892 xx6906 | $389,078.34 | Profile Management, Garry Graber as Receiver |
| M&T Bank P.O. Box 844 Buffalo, NY  14240 | Profile Management, Inc. | xx9092 xx8565 | $46,720.86 | Profile Management, Garry Graber as Receiver |
| RBS Citizens Bank One Citizens Drive Mail Stop: ROP210 Riverside, RI 02915 | International Recovery Service LLC, d/b/a Financial Mediation Group | xx6459 xx6914 xx6922 xx6930 | $253,472.11 | International Recovery Service, Garry Graber as Receiver |

| Wells Fargo Bank Mail Code Y1372-113 401 Market Street 11th Floor Philadelphia, PA 19106 | Merchant Recovery | xx4004 xx4926 xx4012 | $51.19 | Merchant Recovery, Garry Graber as Receiver. |
|---|---|---|---|---|
| | | **TOTAL seized before funding any expenses** | **$870,784.42** | |

In addition to cash, the Receivership holds a small amount of tangible assets such as office furniture and equipment. The precise value of these items is unknown at this time, although they are not anticipated to be of significant value. The Receiver presently lacks insight into the face value of the debt portfolios owned by the Corporate Defendants. The Receiver will continue to investigate access to the portfolios and their potential value, if any.

The Receiver also sought to recover the funds transferred to MLA Holdings in violation of the Ex Parte Order. The Receiver demanded a return of the funds and received a wire transfer from MLA Holdings (provider of debt portfolios) to the Receiver's account for IRS in the amount of $127,292.00 on or about April 3, 2015.

The following payment processor accounts were frozen and moved into Receivership Accounts at M&T Bank:

| Payment Processor | Entity | Date Received | Amount Received |
|---|---|---|---|
| Electronic Merchant Systems | Merchant Recovery Services, Inc. | May 14, 2015 | $6,719.93 |
| Forte | 4 Star Resolution, LLC | April 6, 2015 | $34,992.86 |
| Global Payments | 4 Star Resolution, LLC | May 11, 2015 | $25,581.25 |
| Global Payments | Profile Management, Inc. | May 6, 2015 | $327.97 |
| Global Payments | International Recovery Service, LLC | May 6, 2015 | $41,425.69 |
| Global Payments | International Recovery Service, | May 11, 2015 | $185,793.64 |

| | LLC | | |
|---|---|---|---|
| Global Payments | Merchant Recovery Services, Inc. | May 11, 2015 | $110,702.31 |
| Merchant E-Solutions | Profile Management, Inc. | March 18, 2015 | $42,301.74 |
| | | | |
| | | **TOTAL** | **$447,845.39** |

The Receiver will follow with the payment processors identified by the principals of the Corporate Defendants in their examinations in an attempt to recover additional funds.

As of May 28, 2015, after processing payroll as approved by the Court, paying March, April and May rent for office space and other miscellaneous expenses, the Receivership Accounts have a total of $981,492.89 remaining.  The Corporate Defendants currently do not generate any revenue.

## V.    Liabilities of the Receivership

The main liabilities of the Receivership have been employee payroll, office rent payments and telecommunications services.

As of the date of this Report, the Receivership had identified the following liabilities:

& Pre-Receivership Accounts Payable which have not been funded:        $110,437.20

    o   Accounts Payable include rent, telecommunication services and software licensing fees for collection and research software used by the Corporate Defendants.

& Pre-Receivership Payroll funded by Receiver:        $257,065.12

& Receivership accounts payable funded as of May 27, 2015:        $207,142.06
   An itemization of all expenses is attached hereto as Exhibit "A"

& Litigation

    o   The Receiver is working to gather information on the pending civil actions filed against the Corporate Defendants to determine the nature of the litigation and potential exposure for the Receivership.  Plaintiffs' counsel in the matters listed below have been provided a copy of the Ex Parte Order and informed of the stay provided therein.

| Plaintiff | Defendant | Court/Dept. | Case Number | Attorney Name/Address |
|---|---|---|---|---|
| Paul Eadie | Check Fraud Services, LLC | US District Court - NDGA | 13-3339 | Dwight Bowen, Esq. Suite 400 235 Peachtree St, N.E. Atlanta, GA 30303 (404) 880-3310 |
| Lisa M. Miller | 4 Star Resolution LLC Travell Thomas Maurice Sessum Profile Management, Inc. | NYS Division of Human Rights | 10171566 | Tasha E. Moore Regional Director (not an attorney) Walter J. Mahoney State Office Building 65 Court Street, Suite 506 Buffalo, NY 14202 |
| John Andrew | ARS Services (Fort Lauderdale, FL) | State of Minnesota Office of Attorney General | | James Van Buskirk, Esq. Assistant Attorney General Minnesota Attorney General's Office 445 Minnesota Street 1200 Bremer Tower St. Paul, MN 55101-2130 |
| Sue Krook | Profile Management | US District Court – WDWI | 11-00337 | Thomas John Lyons, Sr. Esq. Lyons Law Firm P.A. 367 Commerce Court Vadnais Heights, MN 55127 |
| Joanne Edwards | Profile Management | US District Court – NDIL | 08-06397 | David M. Marco, Esq. SmithMarco, P.C. 205 North Michigan Avenue Suite 2940 Chicago, IL 60601 |
| April Stoll | 4 Star Resolution LLC | Dallas County Court, Texas | 2014-1974 | T. Dean Malone, Esq. 900 Jackson Street, Suite 730 Dallas, Texas 75202 |
| Lori McKee | 4 Star Resolution LLC | McLennan District Civil Court, Texas | 2014197-4 | John Fugate, Esq. The Liberty Place 6th Street, Suite 600 Waco, TX 76701 |
| Kurtis Hamler | Profile Management | US District Court – EDPA | 08-04588 | Robert P. Cocco, Esq. Law Offices of Robert P. Cocco PC 1500 Walnut Street, Suite 900 Philadelphia, PA 19102 |
| Michael Pesina | 4 Star Resolution LLC | Adams County Court, Colorado | 2014C66756 | Gary Merenstein, Esq. 773 Furrow Way Lafayette, CO 80026 |

14

| | | | | |
|---|---|---|---|---|
| Chester Savant | Profile Management | US District Court – WDNY | 13-00605 | Jacob J. Scheiner, Esq. Fredrick Schulman & Assoc. 30 E. 29th Street New York, NY  10016 |
| Karen Green | Profile Management | US District Court – NDOH | 12-02225 | Michael L. Fine, Esq. 3637 South Green Rd, 2nd FL Beachwood, OH  44122 |
| Melanie Adkins | Check Fraud Services | US District Court – NDIN | 13-00179 | David M. Marco, Esq. SmithMarco PC 205 N. Michigan Avenue Suite 2940 Chicago, IL  60601-5927 |
| Cassandra Lee | Check Fraud Services | US District Court – SDFL | 13-14446 | Jason Stuart Weiss, Esq. Weiss Law Group, PA 12512 W. Atlantic Blvd. Coral Springs, FL  33071 |
| Shaquita Evans | 4-Star Resolution LLC | US District Court – NDIL | 15-01247 | David B. Levin, Esq. UpRight Litigation, LLC 79 W. Monroe Street 5th Floor Chicago, IL  60603 |
| Joshua Myers | 4-Star Resolution LLC | US District Court – EDTX | 13-00540 | Jeffrey D. Wood, Esq. McClendon & Milligan 103 N. Goliad, Suite 204 Rockwall, TX  75087 |
| Amy Cordova | 4-Star Resolution | US District Court – WDNY (Dismissed) and US District Court – Colorado | 13-00066 (dismissed) 13-1185 | Ryan Scott Lee, Esq. Krohn & Moss, Ltd. 10474 Santa Monica Blvd #401 Los Angeles, CA  90025 |
| Charlene Evans | 4-Star Resolution LLC | US District Court – NDIL | 14-04945 | David B. Levin, Esq. UpRight Litigation, LLC 79 W. Monroe Street 5th Floor Chicago, IL  60603 |
| Emily Blackstock | 4-Star Resolution LLC | Superior Court of California | 14-02347 | Todd M. Friedman, Esq. 8730 Wilshire Blvd., #310 Beverly Hills, CA  90211 |

&   Professional Fees of the Receivership through April 30, 2015          $215,664.00
     (*see* Section X below).

15

### VI.     <u>Preservation of Receivership Assets</u>

The Receiver has taken a number of steps to preserve the assets of the Receivership.  The physical premises of the Corporate Defendants were secured by changing the locks to all office locations.  On site twenty four hour security was utilized for the first few days of the receivership.  On site security was terminated when the Receiver's personnel were no longer on site collecting documents.

With respect to non-physical assets, the funds in the Corporate Defendants' frozen bank accounts were transferred into receivership accounts at M&T Bank.

The debt portfolios held by the Corporate Defendants have not been identified.  The receiver has not been able to determine which portfolios are owned by the Corporate Defendants as opposed to portfolios which may have been placed on consignment with the Corporate Defendants.  The testimony of the principals of the Corporate Defendants at their examinations have not provided any clarity in making any determination as to the ownership of the portfolios.

**a. Personal Property:**  If there is no settlement of this matter at the upcoming mediation which results in the Corporate Defendants resuming collection activities, the Receiver intends to engage an auctioneer and liquidate the furniture, fixtures and equipment at the business premises of the Corporate Defendants.  The Receiver is in the process of engaging an auctioneer and intends to make a motion to approve such sales in the near future.  Alternatively, the Receiver may seek authority to abandon certain personal property to the landlords at each of the locations should the auctioneer recommend against liquidation based on the value of the personal property.  The Receiver will take precautions to reduce or eliminate the risk of sensitive personal information from being compromised.  Certain computers, servers, as well as the books and records of the Corporate Defendants will removed and stored by the Receiver.  Liquidating

16

certain of the personal property will enable the leased premises to be surrendered to the landlords.

b. **Real Property:**  Several weeks after the receiver was appointed it was brought to his attention that the Corporate Defendants owned certain real property.  This real property is primarily single family homes some of which are being rented.  The Receiver identified the following parcels of real property as owned by the Corporate Defendants:

| Owner | Address |
|-------|---------|
| 4 Star Resolution | 315 Dartmouth, Buffalo, New York |
| Profile Management | 1279 Kensington, Buffalo, New York |
| Profile Management | 56 Fennimore, Buffalo, New York |
| Profile Management | 76 Wecker, Buffalo, New York |
| Profile Management | 44 Rogers, Buffalo, New York |
| Profile Management | 75 Blake, Buffalo, New York |
| TDT Consulting | 699 Northumberland, Buffalo, New York |
| TDT Consulting | 22 Norman, Buffalo, New York |
| TDT Consulting | 704 Norfolk, Buffalo, New York |
| TDT Consulting | 67 Amber, Buffalo, New York |
| TDT Consulting | 11 Humason, Buffalo, New York |
| TDT Consulting | 82 Comstock, Buffalo, New York |
| TDT Consulting | 78 Connelly, Buffalo, New York |
| TDT Consulting | 20 Armin, Buffalo, New York |
| TDT Consulting | 126 Condon, Buffalo, New York |
| TDT Consulting | 52 Proctor, Buffalo, New York |
| TDT Consulting | 75 Mayer, Buffalo, New York |
| TDT Consulting | 76 Bickford, Buffalo, New York |

The Receiver engaged Cory Haqq with Hastings Cohn Real Estate, to do an analysis of the value of the Corporate Defendants' real property holdings.  A copy of the report prepared by Mr. Haqq is annexed hereto as Exhibit "B".  The Receiver has determined, based on the report provided by Mr. Haqq, that the liquidation of this real property is not likely to provide a benefit to the receivership estate given the expense of administering these assets and preparing them for sale.  The Receiver also believes that supervising the management of these parcels will consume significant amounts of time for the Receiver's counsel, and therefore create an additional

17

expense to the estate.  These expenses along with the risk to the Receivership estate of managing vacant, and in some cases dilapidated, houses favor the abandonment of this real property.   The Receiver intends to take steps to transfer title for the above-referenced properties from the Corporate Defendants to the individual defendants pursuant to a stipulated order or motion practice if a consensual resolution cannot be reached.

## VII.    Pursuit of Additional Assets

The Receiver and his accountants have attempted to review whatever books and records were kept by the Corporate Defendants.  The Corporate Defendants failed to maintain even basic accounting records such as balance sheets, income statements, tracking of accounts payable and accounts receivable.  With respect to monitoring the businesses' financials, the principals of the Corporate Defendants largely deferred to their accountants and could only identify the online bank statements as their method of tracking income and expenses.

In the absence of even the most basic of accounting records, the Receiver has focused on bank statements and the identification of the various payment processors utilized by the Corporate Defendants.  The Receiver has successfully recovered $447,845.39 from the payment processors to date.  The Receiver has communicated with two accountants who worked with the Corporate Defendants; neither have been able to provide information which would lead to recovery of additional assets.

## VIII.   Handling of Liabilities

The Receiver is assessing the liabilities of the Corporate Defendants and how each should be handled going forward.  The most significant liabilities of the Receivership are payroll and the office leases.  The Receiver has communicated to all of the landlords his intent to surrender the leased premises at each of the locations.  The lease for 2400 Seneca Street expires on November

18

2, 2017; the lease for the Charlotte office expires on November 30, 2017 and the lease for 3735 Genesee Street expired on May 14, 2015.  The Receiver will continue to investigate the potential liability under the leases for 1839 Seneca Street and 2800 Walden Avenue.  Unless a settlement is reached at mediation allowing the Defendants to resume collection activity, the Receiver will be working with property managers to negotiate a termination or surrender of Corporate Defendants' leased office space.

The Receiver is also assessing the Receivership's continued need for certain software licenses used by the Corporate Defendants prior to the appointment of the Receiver but that may still be necessary to access corporate information as well as debtor information as the Receiver carries out his duties.

The Receiver has determined that the telecommunications services for each of the offices should be terminated as they constitute a monthly expense in the approximate amount of $12,040.24 for all offices.  Based on the Receiver's discussions with Vaspian, the telecommunications service provider, if the businesses were to be re-opened it would not create a significant burden to re-establish the telecommunication services.  Vaspian owns all of the phones at each of the locations and will be recovering their owned property in the near future.

**IX.**     **Future Lawful and Profitable Operation of the Corporate Defendants:**

The Receiver retained Kelly Besaw and Chiampou Travis Besaw & Kershner LLP to assist in a determination as to whether the Corporate Defendants could be viably operated.  The Receiver's forensic accounts prepared a report on the financial condition of the Corporate Defendants dated April 3, 2105 a copy of which is annexed hereto as Exhibit "C".  The accountants were unable to conduct a thorough review of the viability of the companies due to the "vastly incomplete" accounting records.  There were no accounting records or tax returns for

19

2013 or 2014 available.  There was very little information stored in the Peachtree accounting software and what information was available was determined to be unreliable to support an analysis.  Mr. Besaw discussed the status of the books and records with Mr. Maldonado who performed accounting work for the Corporate Defendants other than Merchant.  Mr. Maldonado confirmed that there was little financial information to support further analysis.  The Receiver issued Subpoenas for the production of documents on Mr. Maldonado as well as Mr. Joseph who is referenced in Mr. Besaw's report.  Neither Mr. Maldonado nor Mr. Joseph were able to produce documents which shed additional light on the finances of the Corporate Defendants.  The Receiver will continue to investigate the availability of financial data with respect to Merchant.

Following the production of the financial disclosures, as required by the Ex Parte Order, of the Corporate Defendants and the individual defendants the Receiver asked his accountants to conduct an analysis of the disclosures.  A copy of the April 28, 2015 report is annexed hereto as Exhibit "D".  The financial disclosures did not provide meaningful insight into the financial condition of the Corporate Defendants.

It is the Receiver's opinion that, at the time of his assumption of control, the collection operations of the Corporate Defendants were based upon collection practices that were not compliant with either the Fair Debt Collection Practices Act ("FDCPA") or New York State consumer protection statutes.

The Receiver has come to this conclusion through a thorough, but not exhaustive, review of the following items:

1.    Interviews of many collectors taken on the first day of the receivership regarding their practices;

2.    Company records and personnel files;

20

3.     Over a 1,000 pages of scripts and other collection notes, both typed and handwritten, recovered at collectors' work stations and other places around the Corporate Defendants' offices (a sample of the scripts recovered at each of the locations along with an analysis of the FDCPA violations contained in each of the scripts is attached hereto as Exhibit "E"[2]); and

4.     Recordings of over 150 calls from the Corporate Defendants located at 2400 Seneca, 2800 Walden and Charlotte[3] made during the months of October 2014, November 2014, December 2014, January 2015 and February 2015 (transcripts of several of the calls made from each of the Corporate Defendants' locations and reviewed by the Receiver are attached hereto as Exhibit "F").[4]

Through the review of the materials referenced above, the Receiver has determined that each of the Corporate Defendants operated in a similar manner using the same or substantially the same scripts, with only minor variations, for nearly every consumer contact conducted by the collectors at each of the Corporate Defendants.  Each of the Corporate Defendants outgoing calls followed the following pattern:

1.     The Debt Collector identifies the consumer.

2.     The Debt Collector introduces him or herself and the company he or she is calling on behalf of using a fictitious name for the company.  These fictitious names included FFG, Revenue Recovery Services, FSR, FRS Services, ARS, Global Management Group, GMG, GMG Group, USR, USR & Associates, United Recovery Service and CMG Holdings as well as several others.  The Debt Collectors, rarely, if ever would use the real name of any of the Corporate Defendants.

3.     The Debt Collector tells the consumer that they are on a "federally record line" for the purpose of gathering "admissible evidence."

---

2     Exhibit E is broken down in to several subparts that relate to the locations that the scripts were recovered from. Exhibit E-1 contains scripts recovered at the 2400 Seneca location; Exhibit E-2 contains scripts recovered at the Charlotte location; Exhibit E-3 contains scripts recovered at the 2800 Walden location; Exhibit E-4 contains scripts recovered at the 1839 Seneca location; and, Exhibit E-5 contains scripts recovered at the 3537 Genesee location.

3     Recordings from the Corporate Defendants located at 1839 Seneca and 3537 Walden could not be obtained by the Receiver.  The missing recordings were deleted on the evening of February 11, 2015, after the Receiver took control of the premises, by individuals associated with the Corporate Defendants with remote access to the phone system.

4     Further, the Receiver notes that, at the time of the assumption of control by the Receiver, Travell Thomas was already under an Assurance of Discontinuance ("AOD") for prior alleged violations of the General Business Law ("GBL") Section 349 and Executive Law Section 63(12).

4.      Often, the Debt Collector would characterize the Corporate Defendants as something other than a debt collection agency.  The Debt Collectors would often state that the Corporate Defendants were arbitrators, meditators, pre-litigation departments, process servers or risk management firms as well as various other types of entities commonly connected with the legal system.   Similarly, the Debt Collectors would often identify themselves as "paralegals", "federal mediation officers", and other positions that would commonly be connected with the legal profession.

5.      The Debt Collector would then tell the consumer that there was some form of "civil complaint", "affidavit" or "defaulted disclosure statement" pending or about to be filed against their name and social security number in their county of residence.  The Debt Collector would often state that the civil complaint was for "check fraud", "malicious intent to defraud a financial institution", "breach of contract", "theft of goods and services" or another ominous and legal sounding phrases.

6.      The Debt Collector would then tell the consumer either that they needed to give a statement of intent (asking whether this was intentional or an oversight) or ask if they wanted resolve the matter out of court.  The Debt Collector would then tell the consumer that they had a very short time frame to resolve the matter before they would have no control of whether the matter was filed with the county court and various negative events, including the addition of taxes, penalties and interest and the issuance of wage garnishments, would occur.

7.      The Debt Collector would offer a settlement of the total amount.

8.      If the consumer rejected the settlement, the Debt Collector would make various threats about the client "pursuing them", "wage garnishments", and "judgments" as well as other types of threatening activity clearly meant to deceive the consumer into falsely believing that the Corporate Defendants would pursue legal action against them.

The voicemail messages left by the Corporate Defendants' Debt Collectors also followed identifiable patterns.  The Debt Collector would first then identify themselves and the name of their employer using one of the fictitious names listed above.  The Debt Collector would then state that the message was solely for the particular consumer.  Next, the Debt Collector would state that he or she had received a "civil complaint", "wage garnishment", "defaulted disclosure statement" or some other legal sounding instrument against the consumer's name or social security number and that he or she was seeking a "voluntary statement of intent" from the

22

consumer.  The Debt Collector would then state that it was important that the consumer or the consumer's "attorney" contact them immediately at a particular phone number.  Often, the Debt Collector would threaten wage garnishments or property seizure if the consumer did not return his or her call.  The Debt Collector would conclude the call by giving the consumer a "case", "file" or "docket" number to reference.

While the nature of incoming calls often varied and the Corporate Defendants' Debt Collectors were often forced to deviate from any script based on the reaction of consumers, several patterns also emerged from the Receiver's review of incoming calls.  First, incoming calls were frequently answered with a greeting indicating that the consumer had reached a "Legal Department" or  "Arbitration Department" as well as other indications that they had reached a law office, such as using "and Associates" after one of the fictional names.  Second, consumers were nearly uniformly told that they were on a "recorded" or "federally recorded line" and that the recording could be used as "admissible evidence".  Third, the Debt Collectors frequently attempted to revert to their "talk off scripts" used in outgoing calls and frequently threatened consumers with various types of legal action, including, but not limited to, wage garnishments, increased penalties and fees, and civil judgments.

Whether outgoing, voicemail, or incoming, in each and every call reviewed by the Receiver not a single Debt Collector provides any consumer with the "mini-Maranda" required under section 807(11) of the FDCPA or indicates that the call was made in attempt to collect a debt rather than resolve some form of legal proceeding.  Similarly, not a single Debt Collector in the reviewed calls was willing to indicate that the Corporate Defendant were debt collectors rather than some form of legal office.  Finally, none of the Debt Collectors recorded on the over 150 calls the Receiver reviewed used the actual legal name of the Corporate Defendants when

23

contacting consumers.  Accordingly, the Receiver's review of the Corporate Defendants' interactions with consumers did not reveal a single consumer contact made in compliance with the FDCPA.

The Receiver wishes to emphasize that the review and analysis has not been exhaustive, nor is it definitive.  The Receiver has concluded, however, that, based on all of the information currently available, including the scripts recovered at the Corporate Defendants' locations and the call recordings available to the Receiver, the Corporate Defendants failed to comply the FDCPA or require their Debt Collectors to do so.  Further, based upon the frequent nature of FDCPA violations, the Receiver has determined that the violations of the FDCPA were condoned and, perhaps, even encouraged by the Corporate Defendants' management in order to maximize collections.  Accordingly, the Receiver has concluded that the Corporate Defendants' violations of the FDCPA were pervasive, systemic and, in fact, essential to the Corporate Defendants' business model and, as such, that the Corporate Defendants cannot be operated both legally and profitably.

Further, based on this, the Receiver has concluded that, to the extent consumers have previously settled with the Corporate Defendants, it is more likely than not that those agreements were induced through practices that were not compliant with federal laws and state laws. Therefore, the Receiver has determined that at this time he will not continue to collect funds from consumers who would otherwise be making payments to the Corporate Defendants pursuant to previously entered Settlement Agreements.

## X.    Administrative Costs of the Receivership

The Receiver will make a formal request for payment as required under Section XIII of the Ex Parte Order as modified by the Stipulated Preliminary Injunction Order.  That request will

provide further detail as to the work performed by the Receiver and his agents and the amounts requested for services rendered.  In the interim, the Receiver is providing an overview of the Receivership's administrative costs and rates.

Section XIII of the Ex Parte Order reads "the Receiver and all personnel hired by the Receiver as herein authorized, including counsel to the receiver and accountants, are entitled to reasonable compensation for the performance of duties pursuant to this Order, and for the cost of out-of-pocket expenses incurred by them, from the assets now held by or in the possession or control of, or which may be received by, the Receivership Defendants."  The initial days of the Receivership required many tasks to be completed on an urgent basis to capture as much information as possible upon service of the Ex Parte Order.  This was further complicated by the four locations in Buffalo and one location in Charlotte.  The Receiver had to assemble a large team of professionals to coordinate the immediate access.

Prior to his appointment, the Receiver informed Plaintiffs that his rate for this matter would be $378.25/hour, a 15% discount from his standard hourly rate of $445.00.  That rate was included in the materials presented to this Court for consideration prior to the Receiver's appointment.

Counsel for the Receiver further proposed the following rates for members of his legal team:

- James C. Thoman, Esq. of Hodgson Russ LLP - $263.50/hour (discounted 15% from his standard rate of $310 per hour);

- Steven W. Wells, Esq. of Hodgson Russ LLP - $242.25/hour (discounted 15% from his standard rate of $280 per hour);

- Karalyn M. Rossi, Esq. of Hodgson Russ LLP - $170.00/hour (discounted 15% from her standard rate of $200 per hour);

- Craig T. Lutterbein, Esq. of Hodgson Russ LLP - $187.00/hour (discounted 15% from his standard rate of $220 per hour); and

25

   &   Jeffrey T. Fiut, Esq. of Hodgson Russ LLP - $195.50/hour (discounted 15% from his standard rate of $230 per hour).

The Receiver utilized Hodgson Russ' electronic discovery personnel who have been billed at $153.00 per hour.  The Receiver, in order to carry out his assigned duties, also retained forensic accountants who have been billed at $85 to $240 per hour.

From his appointment through April 30, 2015, the Receiver's attorneys and support staff at Hodgson Russ spent a total of 904.1 hours providing legal counsel and assistance with the administration of the Corporate Defendants' businesses.  Accordingly, the Receiver's counsel expects to bill a total of $206,985.73 in fees for professional services through April 30, 2015.  Expenses for this period are still being compiled.  The Receiver's forensic accountants worked a combined total of 63.05 hours with billings of $8,679.15 through April 30, 2015.

Mindful of the limited assets of the Receivership that have been identified and recovered to date, the Receiver will continue to employ the cost saving measures as described above and will make all reasonable efforts to identify any additional measures that may be helpful in limiting time and expense spent handling Receivership matters.

Respectfully Submitted,

Dated: May 29, 2015                              /s/ Garry M. Graber

                                                    Garry M. Graber, Esq.

079518.00000 Litigation 13766624v2